UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE RODRIGUEZ,<br><br>       Plaintiff<br><br>— against —<br><br>THE CITY OF NEW YORK,<br><br>       Defendant | No. 23-cv-05531<br><br>AMENDED COMPLAINT |

**Preliminary Statement**

1. This is an action about the failure of New York City to provide Jose Rodriguez appellate counsel for nearly 40 years after his conviction of attempted homicide in 1981. The lawyer he was provided by the City failed to perfect his direct appeal, as he had in many other cases, before he was disbarred, depriving Mr. Rodriguez of his constitutional right to counsel.

2. The failure arose from the unconstitutionally inadequate supervision and systemic failures of the City's Assigned Counsel Plan of 1966 (the "Plan"), created pursuant to County Law Article 18-B.

3. The City knew of the grossly inadequate provision of legal services occurring under the plan, and indeed, the issue was studied in depth at the time, but ultimately no changes were made to address the issues until well into the 21st Century.

4. The Plan had no supervision of the members of its panel, no tracking system to ensure appeals were perfected on behalf of clients with lawyers assigned under the plan (referred to as "18-b lawyers"), and no method of rectifying known inadequacies like those Mr. Rodriguez faced.

5. The City of New York ultimately maintained a policy and practice of deliberate indifference to the right of New Yorkers to appellate counsel, denying them a right to challenge their convictions.

6. In Mr. Rodriguez's case, by the time he became aware that he had never received his constitutional right to counsel under the Sixth Amendment, much of the underlying case file was gone, including trial transcripts.

7. It was not until 2021, 40 years after his conviction, that a New York state appellate court determined that given the dearth of records from his underlying trial as a result of the City of New York's unconscionable failures, Mr. Rodriguez's appeal be granted.

## The Parties

8. Plaintiff Jose Rodriguez is an individual residing at 293 Genesee Street, Utica, County of Oneida and State of New York.

9. Defendant, the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York.

## Jurisdiction and Venue

10. Jurisdiction is proper in this Court as the claims arise under the Constitution of the United States.

11. Venue is proper in this Court as a substantial portion of the actions took place in this District and the Defendant is a resident of this district.

## Facts

12. On or about April 2, 1982, following a jury trial, Plaintiff was wrongfully convicted of two counts of attempted murder and criminal possession of a weapon in the second degree.

13. Mr. Rodriguez had only been in the country approximately two years at the time of his conviction after fleeing from Cuba's Castro regime, spoke almost no English and had no understanding of the criminal justice system.

14. On or about April 21, 1982, Mr. Rodriguez was sentenced to twenty years in prison.

15. Upon information and belief, the sentencing minutes of Mr. Rodriguez indicate the need for psychiatric treatment, which was never properly afforded to him despite the Court's urging.

16. The partial record demonstrates that Mr. Rodriguez's trial counsel, despite only practicing for two years at the time he was appointed, fought for Mr. Rodriguez, lodged proper objections, and moved to dismiss the case for insufficient evidence for the underlying charges.

17. Mr. Rodriguez maintains his innocence to this day.

18. The Notice of Appeal was timely filed and Plaintiff was originally assigned to William E. Hellerstein, Esq. However, Hellerstein moved to be relieved and that was granted on or about February 24, 1983, and Thomas P. Burke was assigned as Plaintiff's new appellate counsel and Plaintiff's time to perfect was extended by 120 days.

19. The Defendants, New York County District Attorney's Office (Appeals Bureau), accurately reflected Burke's appointment on Plaintiff's "FILE CARD", but then it inaccurately states that Plaintiff's appeal was affirmed on May 17, 1983, under appeal number 16790. The reason why this is inaccurate is because the Defendants were listing the affirmance of a different "Jose Rodriguez" on Plaintiff's "FILE CARD".

20. The other "Jose Rodriguez" was convicted of a different charge, at a trial with a different Judge presiding, assigned a totally different appellate counsel and would never be reasonably connected to Plaintiff, Jose Rodriguez and no reasonable person would support the conclusion that Plaintiff Jose Rodriguez was similar in any way to the different "Jose Rodriguez", other than the name (which is a very common name).

21. Burke ever took any steps to proceed with the appeal.

22. Mr. Rodriguez had been previously told by his trial lawyer, that he would be informed if his appeal was successful. He never heard from Mr. Burke and for years, just assumed that his appeal had failed.

23. In or around the year 2004, the assigned appellate counsel, Thomas P. Burke, was formally suspended from the 18-B panel for delinquency in perfecting appeals.

24. In 2006, the Disciplinary committee was investigating Burke due to an ethics complaint lodged against him.

25. In 2008, Burke was then suspended from the practice of law for neglecting his duties and ultimately disbarred in 2009.

26. Burke has since passed away.

27. During the passage of almost 40 years, Mr. Rodriguez was never given the opportunity to submit an appeal because the assigned appellate counsel never perfected it

28. It was not until the year 2014, when a fellow inmate attempted to locate his appeal and its resolution when Plaintiff realized the problem and immediately filed a pro se *coram nobis* petition on or about April 16, 2014.

29. The State chose to oppose this petition in 2014 and attached an affirmation that stated that his appeal had been perfected and referred to this "FILE CARD" as accurately reflecting Plaintiff Jose Rodriquez.

30. On or about August 14, 2014, Defendant admitted that its own records did not reflect the appeal ever being perfected but that the Court should refer to the Court's entry affirming the conviction of "Jose Rodriguez" even though that was not the Plaintiff.

31. On August 25, 2014, Plaintiff replied by explaining that the prosecution was citing the wrong "Jose Rodriguez."

32. On or about November 13, 2014, the Court denied the Plaintiff's petition, reciting the incorrect procedural history relying on the Affirmation from the Defendants-District Attorney's Office.

33. On or about November 26, 2014, Plaintiff sought leave to appeal the November 13, 2014, Order and the State opposed that application. On June 29, 2015, Plaintiff's leave to appeal was denied.

34. There was an investigation conducted by the Attorney General's office in or around 2016/2017, which revealed that Mr. Rodriguez's appeal was in fact, never perfected. The results of this investigation proved that Mr. Rodriguez was a victim. As such, on or about February 16, 2017, the Court recalled and vacated its prior order denying the petition.

35. Despite being privy to this information about the disgraced state-appointed attorney, the DA's Office chose to cross-move to dismiss the appeal as untimely.

36. It was not until November 9, 2021 where it was determined as a matter of law that Mr. Rodriguez was "deprived of his right to a 'meaningful appeal' in light of the

undisputedly extraordinary delay of nearly 40 years in perfecting his appeal." People v. Rodriguez, 199 AD3d 469 (1st Dept 2021).

37. On or about February 2, 2022, the application for leave to appeal in the Court of Appeals was denied.

38. Plaintiff was incarcerated in State prison where he spent the next four decades of his life fighting to live another day, suffering physically, mentally, psychologically, emotionally, and legally.

39. Mr. Rodriguez was subjected to multiple acts of violence by inmates, as well as subjected to extreme psychological and physical abuse by corrections officers, throughout his incarceration.

## Monell Allegations

40. For 35 years, Mr. Rodriguez was denied his right to appellate counsel under the Sixth Amendment of the United States Constitution and New York State law.

41. The denial of that right was due to an institutional failure of the City of New York to supervise its "Section 18-b" panel of appellate lawyers.

42. The City of New York had a policy of failing to take even the most simple steps to ensure that criminal defendants, like Mr. Rodriguez, had their Sixth Amendment right to counsel protected, as they were required to do under New York State law:

   a. There was little screening of the Section 18-b attorneys who applied to be on the panel, to ensure they had the necessary skills to even handle the cases in the first place;

   b. Once an attorney became part of the panel, there was never any other review of their work, either to ensure they were actually doing the

        work they performed or to ensure they had kept up with the latest changes in the law;

   c. There was no policy of tracking the cases after counsel was assigned; the City of New York did not even have a list of which cases had been assigned to which panel attorneys;

   d. There was no policy of determining which appeals had been perfected, let alone a policy of tracking the outcomes; and

   e. There was no procedure for tracking which panel attorneys had been disciplined or even disbarred, and even when an attorney was disbarred for dereliction of their responsibilities, there was no procedure for reviewing their case.

43. No policymaker could ever have thought that having so little supervision would ever result in consistent, adequate appellate counsel for the criminal defendants who relied on the panel attorneys to protect their rights. But even though the need to supervise attorneys was obvious, the City of New York had more than constructive notice. The panel's failures were well known.

44. The structure of the 18-B Panel system was substantially created by the City Bar Association in 1966 following the Supreme Court's decision in *Gideon v. Wainwright*, 372 U.S. 335 (1965). Initially, the City of New York relied on pro bono volunteers, which was, predictably, a disaster.

45. Afterwards, New York State County Law § 722 required counties and the City of New York to create systems providing for indigent defense. The New York City Plan

provided for institutional defenders and a Panel of private attorneys to represent indigent defendants in certain crimes and in multi-defendant cases.

46. Significant issues with the 18-B Panel under the Plan were clear by the time of Mr. Rodriguez's appeal.

47. In 1982, the Bar of the City of New York, Committee on Criminal Advocacy, which included numerous experienced lawyers, judges, and law professors, was so horrified by the loq wuality of the representation, that they passed a resolution, finding that " the representation of indigent criminal defendants received inadequate assistance from court-assigned private lawyers." *See, e.g.*, Association of the Bar of the City of New York, Committee on Criminal Advocacy, Resolution (June 9, 1982) [hereinafter 1982 Criminal Advocacy Resolution].

48. The City Bar Association believed the main problem to be their inability to control the quality of representation provided by court-assigned, private "18-B Panel attorneys." The Study of Court-Appointed Lawyers, N.Y. Times, July 22, 1984, at 28, col. 1. [STUDY OF COURT-APPOINTED LAWYERS TO BEGIN - The New York Times (nytimes.com)](). That study became the subject of an NYU Journal of Social Change article by Chester Mirsky and Michael McConville.

49. In that New York Times article, it was reported that "The panel usually approves candidates without an interview. According to a City Bar Association statement, the selection process must be more stringent. There is an 'absence of any effective control over the quality of representation provided by the panel of attorneys who receive assignments.'"

50. Mirsky and McConville reported a study of the assigned counsel system to the Criminal Advocacy Committee of the City Bar Association. At the time of the study, Chester

Mirsky was a member of the Criminal Advocacy Committee. He later served as a Subcommittee consultant charged with reviewing this study's findings and with making policy recommendations to the City Bar Association.

51. Court observations for the study occurred between September 1984 and April 1985. The initial Draft Report was completed in June 1985. The Report, containing 376 pages, 81 tables and 8 figures, sought to provide an overview of New York City's indigent defense system, demographic data on the characteristics of 18-B Panel attorneys and Legal Aid Society staff attorneys, an analysis of the distribution of work and income within the Panel, the structure and patterns of the Panel attorneys' compensation claims, the quality of representation afforded indigent defendants by both defense entities, and the comparative costs of Panel and Society representation.

52. In order to make sense of the workings of the 18-B panel, the authors and the Committee held hearings at which representatives of the City of New York, the Legal Aid Society, the Criminal and Supreme courts, and other interested groups were invited to share their views with the Committee and with Professors McConville and Mirsky.

53. The report included a proposal for a unified system of indigent criminal defense, for reform of the Society, and for reorganization of the Panel. Between June and November 1985, the City Bar Association distributed our report to interested groups and to individuals, including the administrators of the assigned-counsel panels, the management of the Legal Aid Society, and the management of the Association of Legal Aid Attorneys (the Legal Aid Society staff attorneys' union).

54. The Society's management and a representative from the Association of Legal Aid Attorneys appeared before the City Bar Association's Committee on Criminal Advocacy and submitted responses to our preliminary findings.

55. It contained 93 pages and included an additional 23 tables based on the Society's responses to the Criminal Advocacy Committee of the City Bar Association and our audit of the Society's monthly Caseload Activity Reports, its case selection practices, the work responses of its attorneys at arraignment in Criminal Court, its post-arraignment appearance rate, and the 1984 'weighted' cost of a case for the Society and for the Panel.

56. In October 1986, the City Bar Association released an "action report" as a response to the research. This report called for a "mid-range" contract defender, run by the Bar Association, to replace the 18-B Panel. *See* Report of the Ass'n of the Bar of the City of New York Committee on Criminal Advocacy, A System in Crisis: The Assigned Counsel Plan in New York: An Evaluation and Recommendations for Change (1986).

57. Defendant City of New York was further aware of the serious concerns with the pattern of appellate division delays that had been brought by New York State prisoners. Mr. Rodriguez's case was a product of those same crises as discussed in SDNY as early as 1990. *See Mathis v. Hood*, 1990 WL 100869 (SDNY 1990)). It goes without saying that Mr. Rodriguez was prejudiced by these extraordinary delays.

58. In 1990, the Second Circuit granted a *habeas* petition, holding that a prisoner had been denied due process, though no abuse of discretion, where there was neglect to perfect the prisoner's appeal, leaving him "helpless in maneuvering through the complicated system of New York state appellate procedure by himself in his diligent but misdirected attempts to have his appeal heard. Such dilatory conduct on the part of an appointed attorney is, even

generously considered, nominal representation at best.  In addition, despite having been advised of Shapiro's delinquency, for five years the state never removed Shapiro nor even informed Simmons he could have Shapiro removed.  It was as if Simmons had no counsel at all.  Such representation is nominal and ineffective as a matter of law and violates the due process rights of the convicted client." *Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir. 1990).

59. Under State law, it was in fact the City of New York that had the responsibility to manage and prevent such dilatory conduct on behalf of Panel attorneys.

60. Mr. Rodriguez's attorney, Thomas P. Burke, was suspended for failure to provide clients with appellate counsel in 2004 and ultimately disbarred in 2009.

61. Even then, the City of New York took no steps to ensure Mr. Burke's clients had their appeals perfected, to contact Mr. Burke's clients, or to provide them with appellate counsel.

62. Even had the City not been aware of its gross systemic failures through 2004, Mr. Rodriguez went over another decade before receiving any appellate representation whatsoever.

63. But the failures of 2004 and 2009 merely reflect the ongoing and systemic failures of the City of New York to provide appellate counsel as required by State and Federal law.

64. In March 2001, the Appellate Division, First Department's Committee on Legal Representation of the Poor issues a report stating that "the entire system by which poor people are provided legal representation is in crisis."  The report says the causes of the crisis were the "lack of resources, support and respect, and inadequate funding of institutional providers combined with ever-increasing caseloads."

65. While there was a Panel administrator and an office for the administrator, there was on training or supervision of Panel attorneys.

66. There was no tracking of Panel attorneys assuring that they had done their jobs.

67. There was no auditing, measurement, or review of any work of any Panel member.

68. The utter lack of knowledge, despite the obvious failures which were known to the City of New York constituted deliberate indifference to Mr. Rodriguez's Constitutional rights.

69. It was not until 2010, that Executive Order #132 for the City of New York established the "Office of the Assigned Counsel Plan," which was responsible for management of the City's Criminal Defense Panels.

70. The City of New York's official policy of ignoring the Sixth Amendment rights of criminal defendants was the driving force behind the violation of Mr. Rodriguez's rights.

71. Mr. Rodriguez received assigned appellate counsel through the Plan in 1985.

72. His assigned counsel, Thomas P. Burke, failed to perfect his appeal and was indisputably ineffective counsel.

73. Mr. Rodriguez was not alone. Mr. Burke, a member of the appellate panel, was suspended from the 18-b panel in 2004 for his failure to perfect client appeals, after failing to protect the rights of an untold number of his clients.

74. That was over a decade before Mr. Rodriguez began attempts to appeal his conviction – and to this day it appears that no one from the City of New York has attempted to review Mr. Burke's cases to see how many other people may be languishing in prison due to his incompetence.

75. Mr. Burke was later disbarred for neglecting his duties to his clients.

76. Mr. Burke was not an isolated individual who escaped the supervision of the City's employees tasked with ensuring that every criminal defendant had appellate counsel. The utter failures of the 18-b Panel in the early 1980s were well-known.

77. Had the City of New York taken even the most basic steps to supervise the 18-b panel, Mr. Rodriguez would never have spent 40 years in prison.

78. Had the City of New York taken even the most basic steps to institute a policy or system for rectifying Sixth Amendment violations after discovery of issues with appellate counsel, Mr. Rodriguez would have never served the remaining 15 years of his incarceration.

**First Cause of Action**
**Violations of the Sixth Amendment Under 42 U.S.C. § 1983**

79. Plaintiff repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

80. Defendant City of New York deprived Mr. Rodriguez of his rights under the Sixth and Fourteenth Amendments to the United States Constitution to adequate appellate counsel, causing the confinement, and/or continuing the confinement of Mr. Rodriguez without any privilege.

81. Defendant knew of, recklessly disregarded, and/or were deliberately indifferent to the inadequacy of their provision of rights under the Sixth Amendment.

82. As a direct and proximate result of this unlawful conduct, Mr. Rodriguez sustained the damages alleged herein.

## Second Cause of Action
**Violations of Due Process the Fourteenth Amendment Under 42 U.S.C. § 1983**

83. Plaintiff repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

84. The State of New York created a protected liberty interest in the right to appellate counsel.

85. Defendant City of New York deprived Mr. Rodriguez of his rights under the Fourteenth Amendments to the United States Constitution by violating his state created right of due process through adequate appellate counsel, causing the confinement, and/or continuing the confinement of Mr. Rodriguez without any privilege.

86. Defendant knew of, recklessly disregarded, and/or were deliberately indifferent to the inadequacy of their provision of state created rights.

87. As a direct and proximate result of this unlawful conduct, Mr. Rodriguez sustained the damages alleged herein.

**WHEREFORE**, Plaintiff demands the following against the City of New York:

    a.    Compensatory damages;

    b.    The convening and empaneling of a jury to consider the merits of the claims herein;

    c.    Costs and interest and attorney's fees;

    d.    Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
December 8, 2023

WERTHEIMER LLC

By: _____
Joel A. Wertheimer
14 Wall Street
Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com

RICKNER PLLC

By: _____/s/_____

Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*