UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSE RODRIGUEZ,

                                        Plaintiff,


              -against-                                    23-cv-05531 (LAK)


THE CITY OF NEW YORK,

                                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


              Appearances:

                            Rob Rickner
                            RICKNER PLLC

                            Joel A. Wertheimer
                            WERTHEIMER LLC

                            *Attorneys for Plaintiff*

                            John Schemitsch
                            Assistant Corporation Counsel
                            MURIEL GOODE-TRUFANT
                            CORPORATION COUNSEL OF THE CITY OF NEW YORK

                            *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

              Plaintiff Jose Rodriguez languished in prison for nearly forty years without a

meaningful opportunity to appeal.  This miscarriage of justice, Rodriguez alleges, is New York

City's fault.

In 1982, Rodriguez was convicted of attempted murder and criminal weapon possession, and sentenced to 20 years to life in prison.[1]  Rodriguez appealed.  Because he could not afford counsel, his appeal was assigned to an attorney from New York City's "18-b Panel," a city-funded pool of private attorneys that supplied legal representation to indigent criminal defendants.[2]  Rodriguez's trial counsel told him that his appointed appellate counsel would contact him if his appeal succeeded.[3]  Having heard nothing, Rodriguez believed for decades that his appeal had failed.[4]

In fact, Rodriguez's appeal never proceeded because his attorney took no steps to perfect his appeal, a prerequisite for it to be heard.[5]  Even after his appointed attorney had been removed from the 18-b Panel for delinquency in perfecting appeals, suspended from practicing law, and ultimately disbarred, no one bothered to notify Rodriguez or review his file.[6]  It was not until decades later, when a fellow inmate informed him, that Rodriguez discovered the truth.[7]  Ultimately, after years of litigation, the Appellate Division, First Department, dismissed the charges against

---

[1]  Dkt 21(Amended Complaint) ¶¶ 12–14

[2]  *Id*. ¶¶ 18, 45.

[3]  *Id.* ¶ 22.

[4]  *Id*.

[5]  *Id*.

[6]  *Id*. ¶¶ 22–26, 60–61.

[7]  *Id*. ¶ 28.

3

Rodriguez, finding that the failure of his appointed counsel to proceed with the appeal and the extraordinary delay of nearly forty years deprived him of his constitutional rights.[8]

Rodriguez alleges that the City, for decades, ignored mounting evidence that its Indigent Defense Plan was plagued by severe systemic problems. He sues the City under Section 1983 on the theory that the City's plan had no mechanism to supervise 18-b Panel attorneys, leading indigent defendants, like himself, to be deprived of their constitutional right to effective counsel and due process. The City moves to dismiss the complaint, arguing that it has no legal responsibility for Rodriguez's plight.

## Facts[9]

*Plaintiff's Conviction and Appeal*

In April 1982, following a jury trial, Plaintiff Jose Rodriguez – a recent Cuban refugee who spoke little English and lacked familiarity with the criminal justice system – was found guilty of two counts of attempted murder and one count of second-degree criminal weapon possession.[10] As noted, Rodriguez was sentenced to twenty years to life in prison.[11] He continues

---

[8]    *People v. Rodriguez*, 199 A.D.3d 469, 471 (2021).

[9]    In deciding this motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[10]    Dkt 21 ¶¶ 12, 13.

[11]    *Id.* ¶ 14.

to maintain his innocence.[12]

        A timely notice of appeal was filed.[13]  The appellate court ultimately appointed Thomas P. Burke — an 18-b Panel attorney — to represent Rodriguez on appeal and extended the perfection deadline by 120 days.[14]  Burke thereafter took no action to perfect the appeal and never contacted Rodriguez, who — relying on his trial lawyer's assurance that he would be notified if his appeal were successful — assumed that his appeal had failed.[15]

        Burke's neglect in this case was not unusual for him.  He was suspended from the 18-b Panel in 2004 for delinquency in perfecting appeals, investigated by the Disciplinary Committee in 2006 due to an ethics complaint, suspended from practice in 2008, and ultimately disbarred in 2009.[16]  Despite this, "the City took no steps to ensure Mr. Burke's clients had their appeals perfected, to contact Mr. Burke's clients, or to provide them with appellate counsel."[17]

        It was not until 2014, when a fellow inmate alerted him, that Rodriguez learned that

---

12

      *Id.* ¶ 17.

13

      *Id*. ¶ 18.

14

      *Id*.  In New York state court, appeals must be "perfected" in order to be heard by an appellate court. *See* N.Y. Comp. Codes R. & Regs. Tit. 22 § 1250.9 (describing time period to perfect an appeal); *id.* § 1250.10 (describing consequences for failure to perfect an appeal); *id.* § 1250.5 (describing methods for perfecting causes).

15

      *Id*. ¶¶ 21, 22.

16

      *Id.* ¶¶ 23–25.

17

      *Id*. ¶ 61.

no appeal ever had been perfected.[18]  After this discovery, Rodriguez immediately filed a *pro se coram nobis* petition.[19]  The New York County District Attorney's Office opposed Rodriguez's petition, attaching Rodriguez's "file card" which incorrectly recorded that his conviction had been affirmed in May 1983.[20]  While the "file card" for Rodriguez correctly recorded Burke's assignment, it confused Rodriguez's appeal with that of another individual of the same name who had been "convicted of a different charge, at a trial with a different Judge presiding, assigned a totally different appellate counsel and would never [have been] reasonably connected to [Rodriguez]."[21]  Despite Rodriguez's explanation that the file card referred to a different person of the same name, the court denied relief and leave to appeal.[22]

However, after an independent investigation by the New York State Attorney General's office in 2016-2017 confirmed that Rodriguez's appeal never had been perfected, the court vacated its prior order denying the *coram nobis* petition.[23]  The District Attorney's Office nonetheless cross-moved to dismiss the appeal as untimely.[24]

---

[18]     *Id.* ¶ 28.

[19]     *Id.*

[20]     *Id.* ¶ 29.

[21]     *Id.* ¶¶ 19, 20.

[22]     *Id.* ¶¶ 31–33.

[23]     *Id.* ¶ 34.

[24]     *Id.* ¶ 35.

Ultimately, in November 2021, the Appellate Division, First Department, held that "the inadequate, nonexistent, representation by [Rodriguez's] prior assigned counsel [had] deprived him of his constitutional right[]" to appeal.[25]   It concluded also that the delay had not been attributable in any significant part to Rodriguez and that the only effective remedy, which it granted, was dismissal of the 40-year-old indictment.[26]   The Court of Appeals denied the District Attorney's Office leave to appeal in February 2022.[27]

*History of New York City's 18-b Panel*

In 1965, in the wake of *Gideon v. Wainwright*,[28] which first held that the Sixth Amendment's right to counsel in criminal cases applied to the States, the New York state legislature enacted Article 18-b of the New York County Law.  Under Section 722 of Article 18-b, each county or city was required to "place in operation through the county a plan for providing counsel to persons charged with a crime . . . who are financially unable to obtain counsel."[29]

In 1966, Mayor Robert Wagner issued Executive Order No. 178, pursuant to which

---

[25]

*See People v. Rodriguez*, 199 A.D.3d 469, 471 (2021); Dkt 21 ¶ 36.

[26]

*Id.* at 470.

[27]

*Id.* ¶ 37.

[28]

*See Gideon v. Wainwright*, 372 U.S. 335 (1963). Subsequently, in *Douglas v. California*, 372 U.S. 353 (1963), the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment ensures the right to appointed counsel for indigent criminal appellants on first appeals as of right.

[29]

*See* N.Y. County Law § 722.

New York City adopted the Indigent Defense Plan (the "Plan") proposed by several New York bar associations and approved by resolution by the City Council.[30]  The Plan relied both on a private legal aid society and a panel of private lawyers, later called the "18-b Panel."[31]  Under the Plan, "[t]he Association of the Bar of the City of New York and the five county bar associations within the City of New York [were] designated as the bar associations which may prepare panels of attorneys to be rotated . . . and coordinated by an administrator (Administrator) or administrators (Administrators)."[32]  The Administrators, who were appointed by the Appellate Divisions of the First and Second Judicial Departments, prepared panels of attorneys from the list provided by the bar associations.[33]  While the Plan did not contain rules about the supervision of 18-b Panel attorneys,[34] it specified that "[t]he Appellate Divisions of the First and Second Judicial Departments may promulgate such rules with respect to this Plan as they may deem necessary."[35]

      Rodriguez alleges that the Plan from its inception provided little or no supervision

---

[30]
    *See* Dkt 45, Exhibit 5 (Executive Order No. 178 (November 27, 1965)); *see also New York Cnty. Lawyers' Ass'n v. Bloomberg*, 95 A.D.3d 92, 97, 940 N.Y.S.2d 229, aff'd, 19 N.Y.3d 712 (2012) *(*"On November 27, 1965, then Mayor Robert Wagner issued Executive Order No. 178, which, in conjunction with the joint plan of the Association of the Bar of the City of New York and the New York County Lawyers' Association (the 1965 Bar Plan) that was approved by resolution of the City Council on April 28, 1966, established a County Law § 722 (4) combination plan employing the section 722 (2) and section 722 (3) options.").

[31]
    Dkt 21 ¶¶ 44-45.

[32]
    Dkt 45, Exhibit 4 (1966 Bar Plan) at 925.

[33]
    *Id*. at 927.

[34]
    *See* Dkt 47 at 7.

[35]
    Dkt 45, Exhibit 4 at 931.

for 18-b Panel attorneys — a gap that persisted for decades.[36]  Specifically, he alleges that there was little screening of 18-b Panel attorneys to ensure their competence and no policy of tracking, measuring, auditing, or otherwise reviewing the work of 18-b Panel attorneys, including those attorneys who had been disciplined or even disbarred.[37]

By the early 1980s, flaws in the Plan were evident.  A 1982 City Bar resolution condemned the inadequate representation provided by 18-b Panel counsel.[38]  A New York Times article in July 1984 reported that the panel "usually approves candidates without an interview" and lacked effective quality control.[39]  A study of the assigned counsel system in the mid-1980s revealed further problems.[40]  In response to this research, the City Bar Association released an "action report" urging the replacement of the 18-b Panel with a mid-range contract defender model.[41]

Federal courts soon echoed these concerns.  In 1990, faulting supervision of the appointed attorneys, the Second Circuit and a district court in the Southern District of New York granted habeas relief in cases in which 18-b Panel attorneys had allowed multi-year delays in

---

[36]

Dkt 21 ¶¶ 42, 65–68.

[37]

*Id.*

[38]

*Id.* ¶¶ 46, 47.

[39]

*Id.* ¶¶ 48, 49.

[40]

*Id.* ¶¶ 50–51.

[41]

*Id.* ¶¶ 52-56.

9

perfecting appeals.[42]   In March 2001, the Appellate Division, First Department's Committee on

Legal Representation of the Poor declared that "the entire system" of indigent defense was "in crisis"

because of "lack of resources, support and respect, and inadequate funding of institutional providers

combined with ever-increasing caseloads."[43]   Reform arrived only in March 2010, when Executive

Order No. 132 created the Office of the Assigned Counsel Plan to manage the City's criminal

defense panels.[44]

*Prior Proceedings*

Rodriguez brings two claims under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc.*

*Servs. of City of New York*.[45]   He alleges that the City deprived him of his right to adequate assistance

of appellate counsel in violation of the Sixth and Fourteenth Amendment and his right to due process

in violation of the Fourteenth Amendment.[46]

The City moves for judgment on the pleadings on two grounds.   It asserts that (1)

Rodriguez's claims are time-barred and (2) Rodriguez failed adequately to plead a claim under

---

[42]

*Id.* ¶¶ 57-58; *see Simmons v. Reynold*, 898 F.2d 865, 868 (2d Cir. 1990) (affirming habeas relief for a six-year delay where 18-b attorney failed to perfect appeal for five years and during this time the state neither removed the attorney nor informed the defendant that he could have the attorney removed); *see Mathis v. Hood*, 87-CV-6234 (RPP), 1990 WL 100869, at *2–4, n.4 (S.D.N.Y. 1990) (granting habeas relief for an almost six-year delay).

[43]

*Id.* ¶ 64.

[44]

*Id.* ¶ 69.

[45]

436 U.S. 658 (1978)

[46]

*Id.* ¶¶ 79–87.

*Monell*.[47]    In a report and recommendation (the "R&R"), Magistrate Judge Ona T. Wang recommended that the City's motion for judgment on the pleadings be denied in its entirety.[48]

First, Judge Wang rejected the City's argument that Rodriguez's claim was time-barred.[49]    She determined that, under *Heck v. Humphrey*,[50] Rodriguez's claim accrued on February 2, 2022, when the Court of Appeals denied leave to appeal the First Department's decision dismissing the indictment.[51]    Because Rodriguez sued the City on May 2, 2023, within the three-year statute of limitations, his claim was timely.[52] The City does not object to this holding.

Second, Judge Wang determined that Rodriguez sufficiently alleges a causal connection between New York City's failure to supervise 18-b Panel appellate attorneys and Rodriguez's constitutional deprivation.[53]    She explained:

> "Mr. Rodriguez alleges a causal relationship between the City's failures and his own injury by alleging that, had the City properly supervised his 18-b attorney, the erroneous attribution of another man's appeal to his case might have been prevented, or corrected — and Mr. Rodriguez might not have languished for four decades in prison. Specifically, he properly pleads that the City failed to supervise the 18-b

---

[47]     *See* Dkt 47 at 11-12.

[48]     *See* Dkt 62 (R&R) at 16.

[49]     *Id.* at 10–13.

[50]     512 U.S. 477 (1994)

[51]     Dkt 62 at 12–13.

[52]     *Id.*

[53]     *Id.* at 14-15.

attorneys[.]"[54]

She concluded also that Rodriguez alleges sufficient facts that, if true, would make out deliberate indifference by the City.  First, he asserts that the City was on notice that its failure to supervise had caused and continued to cause violations of indigent defendants' constitutional rights to counsel, citing to "numerous reports sounding the alarm that the City had established no effective control over the quality of representation provided by 18-b Panel attorneys."[55]  Second, Mr. Rodriguez's specific case allegedly evidences the City's deliberate indifference.  Despite his appellate counsel's removal from the 18-b Panel for delinquency in perfecting appeals and later suspension and disbarment, "the City neither investigated nor contacted Mr. Rodriguez to investigate whether his appeal remained unperfected."[56]  Therefore, "[b]y 2004 at the absolute latest, it should have been obvious to the City that more supervision was needed to protect Mr. Rodriguez, and other indigent defendants like him, against gross violations of their constitutionally protected rights."[57]

The City objects to Judge Wang's recommendation on the following grounds: (1) 18-b Panel attorneys did not act under color of state law, (2) the City had no supervisory authority over the 18-b Panel attorneys, and (3) Rodriguez does not allege sufficient facts to plead deliberate indifference by the City.[58]

---

[54]     *Id.* at 15.

[55]     *Id.* at 15-16.

[56]     *Id.* at 16.

[57]     *Id.*

[58]     *See* Dkt 65 (The City's Objections to the R&R).

### *Discussion*

*Legal Standard on Motion*

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim."[59]  To survive a defendant's Rule 12(c) motion, a plaintiff must plead sufficient facts, accepted as true, to state a claim to relief that is plausible on its face.[60]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[61]  The Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[62]

*Municipal Liability*

In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that municipalities and other local government units are "persons" that may be sued under Section

---

[59]

       *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up).

[60]

       *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

[61]

       *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[62]

       *See id*. at 663.

1983.[63]   A municipality, however, is liable only for constitutional deprivations it causes.[64] Accordingly, "a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[65] "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[66]   Accordingly, establishing municipal liability requires a plaintiff to prove that a municipal policy or custom caused the plaintiff to be subjected to a deprivation of a constitutional right.[67]

To plead a municipal policy or custom, a plaintiff need not allege that an official municipal policy or ordinance itself is unconstitutional.[68]   A plaintiff instead may allege "actions taken by government officials responsible for establishing the municipal policies that caused the

---

[63]

See 436 U.S. 658, 690 (1978).

[64]

See id. at 691.

[65]

Id.

[66]

Id. at 694.

[67]

See Agosto v. New York City Dep't of Educ., 982 F.3d 86, 97 (2d Cir. 2020) ("The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees.").

[68]

See Amnesty Am., 361 F.3d at 125 ("[M]unicipal liability does not lie only where the official policy or ordinance is itself unconstitutional.").

14

particular deprivation in question," "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware," or "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference."[69]  Regardless of how the custom or policy is framed, it must be the "moving force" behind the alleged constitutional violation.[70]

Rodriguez frames his *Monell* claim as a "failure to supervise" claim.[71]  Under a failure to train or supervise theory, a municipality's "policy of inaction" can constitute a municipal policy for the purpose of Section 1983.  Specifically, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'"[72]

To establish deliberate indifference in the context of a "failure to supervise" claim, a plaintiff must show "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference,

---

[69]

      *See Buari v. City of New York*, 530 F. Supp. 3d 356, 397–98 (S.D.N.Y. 2021).

[70]

      *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

[71]

      *See* Dkt 21 ¶ 41.

[72]

      *Amnesty Am.*, 361 F.3d at 126 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

rather than mere negligence or bureaucratic inaction."[73]  "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."[74]  A formal finding of misconduct is not required: "if the City's efforts to evaluate [such complaints] were so superficial as to suggest that its official attitude was one of indifference to the truth . . . such an attitude would bespeak an indifference to the rights asserted in those claims."[75]

*The City's Arguments*

　　　　The City argues that Rodriguez's claim should be dismissed because (1) 18-b Panel attorneys did not act under color of state law, (2) 18-b Panel attorneys were not City employees and the City had no supervisory authority over them, and (3) Rodriguez did not allege sufficient facts to plead deliberate indifference.[76]  The City's arguments are unpersuasive.

*Whether Rodriguez's 18-b Attorney Acted Under Color of State Law*

　　　　To state a claim under Section 1983, a plaintiff must allege that his constitutional

---

[73]　　　*See id.* at 128.

[74]　　　*Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

[75]　　　*See Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986).

[76]　　　*See* Dkt 65 at 3–12.

16

deprivation is attributable to a person acting under color of state law.[77]  Pointing to the Supreme

Court's holding in *Polk County v. Dodson*,[78] the City argues that Rodriguez's appellate counsel, Mr.

Burke, did not act under color of state law in his legal representation of Rodriguez and, consequently,

Rodriguez's claim must fail.[79]  The City's emphasis on *Polk* is misguided and correctly was rejected

in Judge Wang's R&R.[80]

   In *Polk*, the Supreme Court held that "a public defender does not act under color of

state law *when performing a lawyer's traditional functions as counsel to a defendant in a criminal

proceeding.*"[81]  By the same logic, a court-appointed attorney, such as an 18-b Panel attorney, does

not act under color of state law in the attorney's day-to-day provision of legal advice and

representation of an indigent defendant.[82]  The City therefore is correct that Mr. Burke would not

have acted under color of state law in counseling Rodriguez or pursuing his appeal.

   But Rodriguez's claim is not against Mr. Burke for such activities.  He instead has

brought a Section 1983 claim against the City for its failure to supervise 18-b Panel attorneys.

---

[77]
  42 U.S.C. § 1983.

[78]
  454 U.S. 312 (1981).

[79]
  *See* Dkt 65 at 4–7.

[80]
  *See* Dkt 62 at 15 n. 11.

[81]
  *Polk*, 454 U.S. at 325 (emphasis added).

[82]
  *See Harvey v. Queens Cty. DA*, No. 18-cv-5373 (MKB), 2020 U.S. Dist. LEXIS 29403, at
*7 (E.D.N.Y. Feb. 20, 2020) ("18-B attorneys . . . do not act under color of state law when
they perform traditional functions of counsel.").

Rodriguez is alleging that the City's policy of inaction – specifically, its failure to supervise[83] – caused his constitutional deprivation by failing to discover Burke's abject failure to take the initial step to pursue Rodriguez's appeal or to remedy that failure.

A municipal policy, in appropriate circumstances, may be established through municipal inaction, such as where the municipality's failure to train or supervise its subordinates amounts to deliberate indifference to constitutional rights.[84] A municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by [the municipality] itself to violate the Constitution."[85] Here, the requisite "action" under color of state law was the City's policy of inaction in the face of repeated complaints of constitutional violations stemming from the defects of the Plan. Thus, the City was the "person" that caused Rodriguez's alleged constitutional deprivation.

Put another way, the fact that public defenders and court-appointed legal counsel do not act under color of state law when they perform the traditional counseling and advocacy functions does not shield a municipality from liability for its *own* action and inaction that deprive indigent defendants of constitutionally adequate representation. Indeed, *Polk* makes this distinction clear. In *Polk*, the plaintiff alleged that his public defender's motion to withdraw as counsel on the ground

---

[83]

Rodriguez identifies wide-ranging defects which are described here as a "failure to supervise." Specifically, he alleges that there was inadequate screening of 18-b Panel attorneys; there was no system in place to track assignments or ensure that assigned work ever was completed, including the perfection of appeals; and there was no procedure to track or review the assignments of attorneys who had been disciplined or disbarred. *See* Dkt 21 ¶ 41.

[84]

*See City of Canton*, 489 U.S. at 388.

[85]

*See Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks omitted).

18

that his claims were frivolous deprived the plaintiff of his constitutional rights.[86]  Even though the

Supreme Court held that the plaintiff could not bring a Section 1983 claim against his public

defender because she did not act under color of state law with respect to her representation of the

plaintiff, it did not conclude that a Section 1983 claim against the county necessarily was barred.[87]

A viable claim against the county would have existed if the plaintiff had alleged that an

"impermissible policy" caused his public defender's withdrawal or that his deprivation otherwise

was caused by any constitutionally forbidden rule or procedure.[88]

Accordingly, several courts have concluded that a municipality may be liable under

Section 1983 if its policy regarding the provision of legal counsel to indigent defendants causes a

violation of the constitutional right to effective assistance of counsel.  For example, "[a] deliberate

decision to create criminal courts that operate without providing counsel to indigent defendants . .

. is actionable under § 1983."[89]  Decisions by policymaking officials that cause "truncated case

---

[86]

      *See Polk*, 454 U.S. at 314–15 (1981) ("A full-time employee of the county, Shepard had been assigned to represent Dodson in the appeal of a conviction for robbery.  After inquiring into the case, however, she moved for permission to withdraw as counsel on the ground that Dodson's claims were wholly frivolous.  Shepard accompanied her motion with an affidavit explaining this conclusion.  She also filed a memorandum summarizing Dodson's claims and the supporting legal arguments.").

[87]

      *See id.* at 326.

[88]

      *Id.*  Additionally, the fact that the State must "respect the professional independence of the public defenders whom it engages," *Polk*, 454 U.S. at 321–22, does not mean that the City cannot implement a Plan which ensures that appointed attorneys provide the barest elements essential to constitutionally adequate representation.  For example, ensuring that appeals are timely perfected by assigned counsel who are asked to do so, especially for counsel as notoriously remiss as the late Mr. Burke, does not intrude on the professional independence of assigned counsel.

[89]

      *See Bairefoot v. City of Beaufort, S.C.*, 312 F. Supp. 3d 503, 511 (D.S.C. 2018).

19

handling procedures" that "deprive[] indigent criminal defendants [of] private attorney/client consultation, reasonable investigation and advocacy, and the adversarial testing of the prosecutor's case" also may be the basis of a Section 1983 claim.[90]  Moreover, a county's "policy of assigning the least-experienced attorneys to capital cases without providing any training" may be the basis of a Section 1983 claim against a municipality.[91]

That Mr. Burke would not have acted under color of state law in his counseling and advocacy of Rodriguez (had he ever done so) does not insulate the City from Section 1983 liability. Here, the City implemented the Plan in an attempt to comply with *its obligation* to provide adequate legal representation to indigent defendants.   Rodriguez alleges, and for purposes of this motion the Court assumes, that the Plan provided no meaningful oversight of 18-b Panel attorneys and that the City was on notice of continuing constitutional violations stemming from that failure.  The alleged deliberate indifference of the City to the constitutional deprivations resulting from the inadequate supervision of 18-b Panel attorneys allegedly constituted a municipal "policy of inaction" that exposes the City to possible liability under Section 1983.

*Whether the City had Supervisory Authority over 18-b Panel Attorneys*

The City argues next that it cannot be liable under a "failure to supervise" *Monell* claim for Rodriguez's alleged constitutional deprivations.

First, it argues that it did not have supervisory authority over 18-b Panel attorneys and

---

[90]

*See Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1133 (W.D. Wash. 2013).

[91]

*See Miranda v. Clark Cnty., Nevada*, 319 F.3d 465, 471 (9th Cir. 2003).

thus cannot be responsible for a failure to supervise them.[92]  It contends that the 1966 Bar Plan,

adopted by the City through Executive Order No. 178, made clear that "the responsibility for

screening and selecting attorneys was borne by both local bar associations and Judicial Departments,

with court-appointed Administrators overseeing assignment and rotation of panel attorneys."[93]

        Second, the City argues that "failure to supervise" claims apply only to municipal

employees and therefore cannot apply to private attorneys, such as 18-B Panel attorneys.[94]

        The City ignores the fundamental point.  The structure upon which the City's

contention rests was its deliberate choice.  Under N.Y. County Law Section 722, the City had the

responsibility to implement a plan and the "sole discretion" to select its features.[95]  Although the City

resists the characterization that it "delegated" supervisory authority,[96] it is clear, first, that the

responsibility to put in place a plan which would provide constitutionally adequate counsel to

indigent defendants belonged to the City and, second, that the City conferred limited authority to

---

[92]

    Dkt 65 at 7–11.

[93]

    *Id*. at 8.

[94]

    *Id.* at 4–5.

[95]

    *See New York Cnty. Lawyers' Ass'n v. Bloomberg*, 95 A.D.3d 92, 101, aff'd, 19 N.Y.3d 712
(2012) ("In enacting article 18-B of the County Law, the Legislature unambiguously placed
the responsibility for implementing an Indigent Defense Plan on the county or city, not on
the County Bars . . . The Legislature also gave the county or city, not the County Bars, the
sole discretion to select the components of the plan, provided that the plan conformed to one
of four statutory options set forth in section 722 (1)-(4).").

[96]

    *See* Transcript of Oral Argument at 9 ("It was not the city delegating that authority; the
authority was vested in the appellate division[.]"). That authority, however, came from the
City through its Executive Order.

manage and oversee the Panel through the Executive Order that adopted the Plan.[97]  For example, the authority to screen and appoint 18-b Panel counsel was not an inherent power of the bar associations or the Appellate Divisions.  Nor was this authority conferred by Section 722.  The Appellate Divisions' role was created because the City delegated this authority through the Executive Order.  The crux of the plaintiff's position, however, is that the City failed both to supervise the 18-b Panel members itself or to ensure that its Plan vested that responsibility elsewhere.

Nonetheless the City argues that it cannot be held liable for constitutional deprivations caused by the failures of the Plan that it devised because this Plan assigned the responsibility to oversee 18-b Panel attorneys to other entities.  According to this logic, the City's deliberate choice to delegate oversight shields it from liability for constitutional deprivations caused by the defects of the system it established.  This would be true, the City argues, even if it were on notice that its selected system would continue to cause constitutional violations.  Because the City delegated its responsibility, the City, in its view, is free from liability no matter how disastrously this system performed.

The City cannot circumvent liability under Section 1983 so easily.  "If [] a city's

---

[97]

    The Court does not now decide whether the Appellate Divisions had final policymaking authority with respect to the supervision of 18-b Panel attorneys. Although the City contends that the City did not have "supervisory authority" over 18-b Panel attorneys, it does not argue that Rodriguez failed to identify an appropriate policymaking official in his complaint. Rodriguez's complaint suggests that the Mayor and City Council retained final policymaking authority with respect to the features of the Plan, including the supervision of 18-b Panel attorneys. As noted, however, even if the Appellate Divisions were the relevant final decision makers, the City nonetheless would be liable if the Appellate Divisions were deliberately indifferent to the constitutional violations stemming from their failure to supervise because the City may be liable for the deliberate indifference of municipal policymakers. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  In any case, the Court finds that Rodriguez has alleged sufficient facts to plead a *Monell* claim.

22

lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose."[98]   For this reason, the Supreme Court has made clear that, in certain circumstances, a municipality may be liable for actions by individuals or entities that possess "final authority to establish municipal policy with respect to the action ordered."[99]   Municipal liability may be derived also from the inaction of policymakers, where such inaction amounts to deliberate indifference.[100]   Consequently, even if the City had delegated final policymaking authority with respect to the supervision of the 18-b Panel to the Appellate Divisions – which it does not appear to have done – then the City nonetheless could be liable if the City ignored any failure by the Appellate Divisions to do so.[101]

---

[98]

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988); *see also Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[A]llowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983.").

[99]

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

[100]

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) ("Because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability.").

[101]

This view is supported also by *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985), in which the Eleventh Circuit held that a county could not avoid liability under Section 1983 by contracting out its duty to provide medical care to inmates.  The Eleventh Circuit explained that the duty to provide medical care to incarcerated individuals "is not absolved by contracting with an entity such as Prison Health Services" and that "the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service." *Id.* at 705.  In the same way, a City decision to shift oversight of the 18-b Panel, if there was any, to another entity could not shield it from liability. *See also King v. Kramer*, 680 F.3d 1013, 1013 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."); *cf. Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d 296, 304 (S.D.N.Y. 2005) ("While the City thus delegates responsibility . . . to private entities, this delegation does not absolve the City of its ultimate responsibility[.]").

To be sure, "failure to supervise" claims ordinarily involve municipal employees.  But the City's choice to use private attorneys to fulfill its obligation does not enable it to escape liability.  A "failure to supervise" claim merely is one expression of a municipality's "policy of inaction" which may subject it to a Section 1983 claim.  "[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights."[102]  The central questions therefore are, one, whether the City's failure to respond to continuing complaints of constitutional violations caused by the Plan's defects constituted deliberate indifference sufficient to be considered the "deliberate choice" of the City and, two, whether this "policy of inaction" was the "moving force behind the constitutional violation."[103]

Here, the City made a deliberate choice to address its obligations under the Constitution and Section 722 by adopting the Plan.  Rodriguez alleges that the City demonstrated deliberate indifference at least when it failed to respond to numerous reports of constitutional violations over several decades, which stemmed from the absence of meaningful screening, tracking, and supervision of 18-b Panel attorneys.  Bureaucratic intricacies notwithstanding, the City ultimately was obliged to put and keep in place a plan that would provide constitutionally adequate counsel to indigent criminal defendants.  The City's deliberate choice to delegate certain functions to other entities does not absolve the City of responsibility for the egregious failure that allegedly occurred here.  And this choice would not shield it from liability under Section 1983 for the alleged

---

[102]

See *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *id.* at 1477 (concluding that the "the decision not to take any action to alleviate the problem of detecting missed arraignments constitute[d] a policy for purposes of § 1983 municipal liability.").

[103]

See *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).

deliberate indifference to constitutional violations resulting from the defects of its Plan.

*Whether Rodriguez Has Alleged Adequate Facts Sufficient to Plead Deliberate Indifference*

The City argues that Rodriguez has failed to plead deliberate indifference because he "alleges [that] a single incident of ineffective assistance of appellate counsel and cites to several inapplicable studies, articles and court opinions."[104]

Rodriguez does far more than this. He alleges that the Association of the Bar of the City of New York found, by 1982, that "the representation of indigent criminal defendants received inadequate assistance from court-assigned private lawyers."[105] That finding was followed by studies, reports, articles, and judicial opinions that documented Plan defects.[106] The various sources that Rodriguez cites are sufficient, at least at this stage, to plead that the City was on notice that the deficiencies of its Plan were causing constitutional violations.

Moreover, although Rodriguez's case alone is not sufficient to plead deliberate indifference, it nonetheless supports his claim that the City ignored the obvious defects of the Plan it adopted. Even after his appellate attorney had been suspended from the Panel for delinquency in perfecting appeals, suspended from practice, and ultimately disbarred, no steps were taken to contact Rodriguez or review his case.[107] At this point, "the need for more or better supervision to protect

---

[104]    Dkt 65 at 11–12.

[105]    Dkt 21 ¶ 47.

[106]    *Id.* ¶¶ 40–69.

[107]    *Id.* ¶¶ 23–28, 74.

25

against constitutional violations was obvious."[108] And yet, there was "no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."[109] Together with the numerous cited sources which alerted the City to ongoing constitutional violations caused by the defects of its Plan, Rodriguez has alleged sufficient facts to plead deliberate indifference by the City.

### *Conclusion*

For the foregoing reasons, the City's motion for judgment on the pleadings (Dkt 45) is denied in its entirety.

SO ORDERED.

Dated:        June 26, 2025

Lewis A. Kaplan
United States District Judge

---

[108]        *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

[109]        *Id.*